FILED

at_____ O'clock & _____min_____M

AUG 1 5 2005

United States Bankruptcy Court
Columbia, South Carolina (33)

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

IN RE:

Thomas Law Willcox,

                                        Debtor.

Thomas Law Willcox,

                                        Plaintiff,

        v.

Rodger Stroup, Director, South Carolina Department
of Archives and History; State of South Carolina ex
rel. Henry McMaster, Attorney General for the State
of South Carolina; John M. Willcox, and Kathryn
Willcox Patterson,

                                        Defendants.

C/A No. 04-09605-W

Adv. Pro. No. 04-80337-W

**ORDER**

Chapter 11

ENTERED

AUG 1 5 2005

KPD

This matter comes before this Court for trial in the above-captioned adversary proceeding

pursuant to a complaint (the "Complaint") filed by Thomas Law Willcox (the "Debtor" or

"Plaintiff") against the Defendants State of South Carolina ex rel Henry McMaster, Attorney General

and Rodger Stroup, Director, South Carolina Department of Archives and History (collectively, the

"State" or "Defendants"). The Defendants John M. Willcox and Kathryn Willcox Patterson filed

a counterclaim asserting ownership rights. By Order entered March 3, 2005, the claims raised by

John M. Willcox and Kathryn Patterson were bifurcated upon the request of the parties.[1] Also before

the Court is the State's Motion for Certification of Questions of Law to the State Supreme Court.

Based upon the trial of this matter, the evidence presented, the arguments of counsel and the

applicable law, the Court makes the following Findings of Fact and Conclusions of Law pursuant

---

[1]    In the March 3, 2005 Consent Order, counsel for Plaintiff and counsel for Defendants Willcox and
Patterson indicated that if the State were to prevail, the Willcox and Patterson Defendants' claims would be moot.

to Federal Rule of Civil Procedure 52, which is applicable in bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7052.[2]

## FINDINGS OF FACT

1.    Plaintiff/Debtor Willcox possesses approximately 444 documents (the "Documents") consisting of documents concerning two former Governors of South Carolina, Governors Francis Pickens (1860-1862) and Milledge Bonham (1862-1864) during their administrations.

2.    It is undisputed that the Documents concern Confederate military reports, correspondence and telegrams between various Confederate generals, officers, servicemen, and government officials, and related materials. The Documents also address a wide variety of official duties of the Governor during that time period. Plaintiff found the Documents in a bag in his stepmother's closet after she had passed away, sometime during 1999-2000. Plaintiff testified that he had not been aware of the existence of the Documents prior to this time.

3.    Plaintiff eventually sold a few of the Documents to different individuals and has given two (2) to his wife. In May 2004, Plaintiff entered into a contract, through his company Haulover Development Corporation, to auction the remaining Documents.[3]  The Documents had been previously appraised at approximately $2.4 million.

4.    The proposed auctioneer testified at trial and indicated that he had extensively marketed and advertised the auction of the Documents. The auctioneer also testified that he met with Defendant Rodger Stroup, Director of the South Carolina Department of Archives and History (the

---

[2]    The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

[3]    Plaintiff indicated that he used the company name for reasons of privacy and to effectively order his business affairs.

"Department of Archives") prior to the scheduled auction and that Stroup sought permission to place the Documents on microfilm prior to sale for historical preservation purposes. While there was some dispute about the content of the parties' conversation,[4] there is no dispute that Plaintiff agreed following that conversation that the Documents could be microfilmed.

5.      One day prior to the auction of the Documents, scheduled for August 7, 2004, Stroup and the Attorney General's Office for the State of South Carolina obtained a restraining order in state court preventing the sale of the Documents.

6.      Plaintiff testified that he was seeking to auction the Documents due to serious personal and financial strains. Following the enjoinment of the auction, Plaintiff filed for bankruptcy protection under Chapter 11 of the United States Code on August 16, 2004. The Complaint was thereafter filed and this adversary proceeding commenced.

7.      Neither the State nor Plaintiff presented definitive evidence to explain how the Documents came into the possession of Plaintiff's ancestors, although certain evidence related thereto was presented as follows.[5]

8.      Plaintiff is the great-great-nephew of Confederate Major General Evander McIver Law who served in the Civil War. Plaintiff asserts that General Law was involved in the evacuation of Columbia in February of 1865, and that this was the time period during which General Law came into possession of the Documents. The parties do not dispute that in December, 1864, recently-

---

[4]      The auctioneer testified that he was told by Stroup that the Department of Archives was not interested in the Documents. Stroup testified that at the time of his discussion with the auctioneer, he had not yet reviewed the Documents and was not certain whether the State had a claim to them at that time. Plaintiff alleges that Stroup acted with unclean hands when he told the auctioneer the Department of Archives was not interested in the Documents and that the claims of the State should thus be deemed waived, estopped, or barred, as will be further developed herein.

[5]      It is undisputed that there is no evidence that General Law illegally obtained possession of the Documents.

elected Governor A.G. Magrath ordered the State Auditor, James Tupper, to prepare the State's records for removal from Columbia in preparation for the imminent attack upon Columbia by General Sherman. A large number of State archives and records were moved out of Columbia on February 16, 1865 and stored in locations in Chester and Spartanburg, South Carolina, presumably to preserve them from destruction. Thereafter, efforts were made on behalf of the State to return State records to Columbia.[6]

9.    Plaintiff asserts that the papers came into possession of the Willcox and Law families from General Law by being given to Blanche C. Law (Plaintiff's great-aunt and sister of his grandmother) by General Law's descendant, Annie J. Storm. Thereafter, Plaintiff contends the papers were passed to his father and then to Plaintiff.[7]

10.    Both parties agree that a February 16, 1896 letter from General Law to a book dealer in New York may concern some of the Documents in question. Some of the records of the Pickens and Bonham administration are at the Library of Congress, allegedly sold to it from this same New York book dealer. Whether the documents in General Law's possession are in fact part of these same referenced documents at the Library of Congress is not certain.

11.    At trial, testimony was presented by Plaintiff and an expert witness on behalf of Plaintiff.[8] Plaintiff's expert witness testified that historically, the State has been inactive in securing

---

[6]    Many of the exhibits presented by both parties concerning the removal of the papers and the return of papers following the Civil War are unreadable copies. It is the Court's understanding that the exhibits presented are the best versions available, and the Court does not believe its decision has been hindered by the quality of these exhibits.

[7]    As previously noted, litigation with respect to any inter-family entitlement to the Documents was bifurcated based upon the request of the parties and any dispute between them is not addressed herein.

[8]    The auctioneer also testified on behalf of Plaintiff as to the events leading up to the auction date and the injunction.

its records and that, until the creation of the Historical Commission of South Carolina in 1905, there were largely no efforts to preserve public records. He also testified that there is little information as to where Governor's records are kept or have been kept in the past, but that such records are spread about and that private collectors and the South Carolina Historical Society have played a large role in their preservation. Expert witness testimony was also presented by the State by two archivists from the Department of Archives and by Stroup. The archivists testified that the Documents are similar in nature to other documents housed at the Department of Archives from the Pickens and Bonham administrations, and have markings on them consistent with the docketing systems used on those same documents for the purpose of organizing the retention and retrieval of the documents. The State presented testimony that this docketing system includes tri-folding the document, with a notation on the back showing to whom the final version of the documents was sent. The State also indicated that incoming correspondence was similarly docketed and may additionally include notations about actions taken in relation thereto. The State also presented testimony that the Documents are similar to correspondence of other Governors stored at the Department of Archives. Testimony was further presented by the State that these Documents are consistent with what would be considered by the Department of Archives as a public record that would be accessioned into its collection. Finally, the State presented testimony that, while it only has records of one antebellum Governor, it has some records of every other South Carolina Governor since 1860, with few exceptions.

12.     Evidence was also presented by both parties that the Documents in this case have been on microfilm at the Southern Historical Society, University of North Carolina, Chapel Hill, since the late 1940's. Plaintiff presented evidence in the form of correspondence between General

Law's granddaughter, Annie Storm, and the University of North Carolina as well as with R.L. Meriwether, who was affiliated with the South Caroliniana Library and apparently to some extent with the University South Caroliniana Society. The correspondence concerns Ms. Storm's efforts to sell the Documents to either the Southern Historical Society or the South Caroliniana Library. As a result of these communications, the Documents were placed on microfilm at the Southern Historical Society, University of North Carolina. In the correspondence, Ms. Storm refers to the papers as original South Carolina State House papers entrusted to General Law. Plaintiff asserts that the correspondence evinces that the State of South Carolina knew of the existence of the collection of Documents since 1948 and that Meriwether was a State employee and Secretary of the South Caroliniana Library, which is part of the University of South Carolina. The State asserts that Meriwether was acting on behalf of the South Caroliniana Society rather than as a public employee.

13.    The parties presented a summary list description of the Documents.[9] There was no convincing evidence from either party as to the exact history of the Documents and precisely how they came into Plaintiff's family's possession. Nevertheless, the parties seek a determination of issues concerning the nature of the Documents, ownership thereof, and other defenses despite this lapse in history.

---

[9]    The parties chose to submit the summary list rather than the individual Documents into evidence, such that the Court is to rely on the descriptions contained therein, and this ruling is to apply to all Documents collectively. The State asserts that the summary mistakenly identifies some of the documents as "ALS" meaning "autograph letter signed," an outgoing letter signed by the author, but that some of those Documents are retained drafts. Otherwise, the parties do not appear to dispute the descriptions provided. The stipulation of the parties restricts the Court's review of the actual Documents and limits the Court to the evidence provided by the parties in relation to the Documents.

## CONCLUSIONS OF LAW

### I.    PROCEDURAL POSTURE AND BURDENS OF PROOF

The Complaint seeks declaratory relief and a determination that the Documents are property of the bankruptcy estate. It has been recognized that the burden of proof as to what is property of the estate generally lies with the creditor. In re Altman, 230 B.R. 6, 11 (Bankr. D. Conn. 1999), vacated in part on other grounds, 254 B.R. 509 (D. Conn. 2000), In re Datesman, No. 98-30369, 1999 WL 608856, at *2 (Bankr. E.D. Pa. Aug. 9, 1999). Nevertheless, in this case, Debtor/Plaintiff filed the Complaint seeking such determination, and the burden of proof in declaratory judgment actions lies, as a general principle of law, with the moving party who is held to "have assumed the risk of nonpersuasion." 10B Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE § 2770 (Civil 3d 1998). See also Weller v. Texas Guaranteed Student Loan Corp. (In re Weller), 316 B.R. 708, 711 (Bankr. W.D. Mo. 2004) (party seeking declaratory judgment bears burden of proof); Air Vectors Assoc. v. New York State Dep't of Trans. (In re Air Vectors Assoc.), 53 B.R. 668, 685 (Bankr. S.D.N.Y. 1985) (plaintiff in declaratory judgment action must sustain the burden of proof and bear the risk of nonpersuasion of prima facie case). Although Plaintiff did not specify whether he is relying upon the federal Declaratory Judgments Act, 28 U.S.C. § 2201, which grants federal courts the authority to hear declaratory judgment cases, See United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 493 (4th Cir. 1998), or the South Carolina Declaratory Judgment Act, the party bearing the burden of proof appears to be the moving party in either case.[10]

---

[10]    The lack of explicitness on the part of Plaintiff does not appear deficient. It is has been recognized that bankruptcy courts have the authority to issue declaratory judgments if the matter involves administration of the bankruptcy estate, which appears to be met in this case. In re Weller, 316 B.R. at 711. No issue was raised by the parties with respect to the Court's authority to issue a declaratory judgment. See Katz v. Wagner (In re Metiom, Inc.), No. 01-12840, 2002 WL 433588, at *1 (Bankr. S.D.N.Y. Feb. 25, 2002) ("The Bankruptcy Court is a 'Court

In the Fourth Circuit, it has been determined that "[w]hen state law provides the rule for decision in a suit for declaratory judgment in federal court, whether or not the burden of proof should be shifted [from the applicable burden] is determined according to the rule in the forum state for similar declaratory actions." Farnsworth Cannon, Inc. v. Grimes, 635 F.2d 268, 273 (1980) (citations omitted). See also Taylor v. Magnolia Manor-Spartanburg (In re Taylor), C/A No. 94-73715, Adv. Pro. No. 94-8202, slip op. at 9 (Bankr. D.S.C. May 26, 1995) (applying South Carolina law on burden of proof in action seeking declaratory judgment on validity of contracts and amount to be paid thereunder). In Vermont Mutual Insurance Co. v. Singleton, the South Carolina Supreme Court addressed the burden of proof under the South Carolina Declaratory Judgment Act and held that:

> Where an action is filed for declaratory judgment seeking affirmative relief, the movant must prove his material allegations by a preponderance of the evidence.

316 S.C. 5, 10, 446 S.E.2d 417, 421 (S.C. 1994) (citing Martin v. Cantrell, 225 S.C. 140, 81 S.E.2d 37 (1954) (burden is on plaintiff to prove material allegations of the complaint). Accordingly, under either analysis, Plaintiff must sustain the burden of proof and bear the risk of nonpersuasion of his prima facie case.

The determination of property rights in bankruptcy is controlled by state law, absent a countervailing federal interest. American Bankers Ins. Co. v. Maness, 101 F.3d 358, 363 (4th Cir. 1996) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.") (citing Butner v. United States, 440

---

of the United States' and has power to hear declaratory matters pursuant to 28 U.S.C. § 2201-2202."). Furthermore, the bankruptcy court clearly has jurisdiction to determine what is property of the estate. PBGC v. Continental Airlines, Inc. (In re Continental Airlines), 138 B.R. 442, 445 (D. Del. 1992).

U.S. 48 (1979)).

In examining state law with respect to ownership of personal property, Plaintiff's initial

burden appears met pursuant to South Carolina law.  The common law provides that ownership of

personalty is presumed from possession.  Nesbitt v. Lewis, 335 S.C. 441, 447, 517 S.E. 2d 11, 14

(S.C. Ct. App. 1999).  See also Wheeler v. Wheeler, 111 S.C. 87, 96 S.E. 714 (1918);  Thompson

v. Chapman, 107 S.C. 461, 93 S.E. 142 (1917).  Therefore, the party out of possession has the burden

of proof as to ownership.  Hammond v. Halsey, 287 S.C. 46, 49, 336 S.E.2d 495, 497 (S.C. Ct. App.

1985).[11]

Ownership of the Documents appears to be the ultimate issue to be decided in this case.

There is no dispute that Plaintiff has possession of the Documents, and that they appear to have been

in the possession of his family since the conclusion of the Civil War.  Since possession is prima facie

evidence of title to personal property, Plaintiff has met his initial burden of proof.  Ex Parte Dort,

238 S.C. 506, 121 S.E. 2d 1 (1961); Elliott v. Wilson, 181 S.C. 406, 187 S.E. 825 (1936); Wheeler,

96 S.E. at 716;  Thompson, 93 S.E. at 143.

The burden thus appears to shift to the State to prove superior title.  South Carolina common

law has established that in order to prove superior title, the challenging party cannot solely rely upon

the weakness of the possessor's title.  Accordingly, the State must prove the strength of its own title

independent of any weakness of Plaintiff's title.  Hammond, 287 S.C. at 49, 336 S.E.2d at 497

(trustee of decedent estate had to prove title remained with decedent based upon strength of his own

---

[11]   The State contends that this rule does not apply to the instant matter because Plaintiff is on notice that the
Documents are government property in that they are addressed to or by government officials.  While the Documents
plainly address military and other government matters on their face, as will be further discussed hereinafter, and are
addressed to or by government officials, the State did not present any binding or persuasive authority that would
appear to override the rule recognized and applied in South Carolina with respect to the burdens of proof on issues
concerning ownership of personal property.

title rather than weakness of defendant's).

## II.    THE DOCUMENTS

The Documents relate to matters of military significance, police powers, as well as to other duties of the Governors during the relevant time period. The State argues that the Documents are property of the State based upon the common law, prior legislative acts, and current statutory authority pursuant to S.C. CODE ANN. §§ 30-1-10(A) and 30-4-20(c) (Law. Co-op. 1991 rev. & West Supp. 2004) (references to the State's arguments concerning §§ 30-1-10 et seq. shall be to the "State Records Act"). The State asserts that the Documents are public records and thus cannot be considered property of the estate. Plaintiff contends that the State cannot meet its burden of proving superior title based upon either the common law or the State Records Act, and that even if the State did prove their entitlement to the Documents, other legal theories and defenses bar the State's claims. In support of its argument, Plaintiff asserts that Governor's records were and are private property, and that historically the State of South Carolina has had few record keeping requirements.

## A.    Statutory Authority and the Nature of the Documents

The State argues that dating back as far as 1719, the State has maintained requirements for record keeping, and that examination of these requirements lend support to the State's position that the Documents at issue are public records that belong to the State. Plaintiff presented testimony to the effect that historically, there were largely no efforts on the part of the State to preserve public records. Further, Plaintiff asserts that an examination of statutory or common law does not support the State's assertion that the Documents are public records. In order to address each parties' argument, an examination of historical statutes that reference record keeping and delineate the role of South Carolina Governors is instructive.

10

The statutes in place during the time periods for which the Documents were created contemplate an extensive public role on behalf of the Governor with broad duties. These include the following. As early as 1719, a Colonial statute provided, in part, that ". . . nothing is more necessary for the well-being of a Colony than the preservation of the publick [sic] records . . . ." Act No. 406, AN ACT FOR PREVENTING THE EMBEZELMENT OF THE PUBLICK RECORDS OF THIS SETTLEMENT, AND FOR OBTAINING THE SAME OUT OF THE HANDS OF SUCH PERSONS AS NOW HAVE THE CUSTODY THEREOF, 1719, Vol. 3, Statutes at Large (Cooper 1838). The Act addressed the situation wherein persons had "made away" with or concealed a number of different records. This Act provided for the recovery of a penalty from those who did not return the records within a specified period of time, and provided for a reward for those who discovered concealed records.[12] The Act further references its enactment by the Governor. Id.

Furthermore, in 1789, South Carolina determined to move certain public records to Columbia. This removal process specifically referenced the Governor's involvement in procuring the preservation and removal of public records:

> All such State papers, necessary at the meeting of the Legislature, as shall be directed by the Governor and Council to be removed, and such records as shall be separate or copied at the time of the removal of the seat of Government to Columbia, shall be removed thereto as is directed . . . .

Act No. 1448, AN ACT FOR THE REMOVAL OF THE PUBLIC RECORDS OUT OF CHARLESTON, AND FOR OTHER PURPOSES THEREIN MENTIONED, 1789, Vol. 5, Statutes at Large (Cooper 1839) (emphasis added). The 1790 Constitution, Article II, provided that:

---

[12]    The Act was later repealed, but appears to have still been in effect in 1838, the date of the printing of the 1838 Statutes at Large.

11

Sec. 11. All officers in the executive department, when required by the Governor, shall give him the information in writing, upon any subject relating to the duties of their respective offices.

Sec. 12. The Governor shall, from time to time, give to the general assembly information of the condition of the state, and recommend to their consideration such measures as he shall judge necessary or expedient.

S.C. Const. §§ 11-12 (1790). These responsibilities of a Governor at that time would appear to generate records as to public business, and, consistent with such assertion, for many years annual appropriations provided for a "Private Secretary" and a "Messenger" for the Governor. See, e.g., Act No. 2886, 1843, Vol. XI, Statutes at Large (Rep. Printing 1873); Act. No. 4567, 1861, Vol. XIII, Statutes at Large (Rep. Printing 1875); Act No. 4700, 1864, Vol. XIII, Statutes at Large (Rep. Printing 1875). Furthermore, these statutes provided for the Governor to account to the legislature annually for the appropriations to his Office.

In 1861, the duties and reporting requirements of the Governor increased to an even greater extent. The Governor had been given considerable authority over an armed military force under Act 4498, 1861, Statutes at Large, Vol. XII, Part II, 1850 - 1861. The Governor was authorized to call into service armed forces, organize new military companies, appoint officers, and generally perform a wide spectrum of military related duties. Id.

In addition, the Constitution of the State of South Carolina dated April 8, 1861 set forth the authority of the executive department, which was specifically stated to be vested in the Governor. See Constitution of the State of South Carolina, with the Constitution of the Provisional Government and of the Confederate States of America: Electronic Edition. South Carolina, Art. II § 1, Convention (1860 - 1862), at http://www.docsouth.unc.edu/southcar/south.html (First edition, 1999, University of North Carolina at Chapel Hill). The Governor's duties included commanding the

12

armies and serving as the Commander-in-Chief of the army and navy, granting reprieves and pardons, taking care that the laws were faithfully executed, and prohibiting the exportation of provisions. Id. at sections 6 through 9. The Constitution of 1861 also provided that all officers in the Executive Department, when required by the Governor, were to give him information, in writing, upon any subject relating to the duties of their respective offices. Id. At section 11 (emphasis added). Furthermore, the Governor was directed to give to the General Assembly of the state information on the state's condition, and recommend to their consideration such measures as he shall judge necessary or expedient. Id. at sections 12 and 13. Finally, he was given the power to convene the General Assembly, and, in cases of disagreement between the two houses concerning adjournment, adjourn the General Assembly. Id.

In many instances, the statutes during 1860-1864, the same period for which the Documents cover, reference Governor duties and mirror those set forth in the Documents.[13] A review of the summary of 444 Documents reveals that a large portion of these Documents relate directly or tangentially to the Governor's broad military duties. These include information relating to military supplies and shortages, military preparations, the strength and condition of the military, documentation of troop movement, accounts and reports on results of certain battles, and use of funds for military purposes. See Defendants' Exhibit 3, List of 444 Documents (the "Summary List").

Several other provisions enacted during the relevant time periods are also reflected in the Documents. For example, in 1861, the Governor was authorized and required to issue bonds or

---

[13]   While some of these provisions were later repealed, they collectively represent the broad duties of the Governor at the time.

stock in the name of the State to continue the construction of the new State House. Act No. 4530,
AN ACT TO AUTHORIZE THE ISSUE OF BONDS OF STOCK FOR CONTINUING THE CONSTRUCTION OF
THE NEW STATE HOUSE, 1861, Vol. XIII, Statutes at Large (Rep. Printing 1875). The Governor was
authorized by this statute to suspend the prosecution of said work, for the reasons provided therein.
One of the Documents dated June 7, 1861, from Governor Pickens to the President of the Bank of
South Carolina, specifically concerns work on the State House and the sale of State stock. Summary
List, June 7, 1861 (Document Number 58).

The Governor also had additional defense and police powers. In 1861, the Governor was
charged with establishing an efficient police for the coasts and inlets of the State, including
procurement of three vessels armed with weapons. The vessels were to be under the control of the
Governor, and the Governor was to account to the Legislature for the amount appropriations drawn
to accomplish the establishment. ACT NO. 4555, AN ACT FOR THE ESTABLISHMENT OF A COAST
POLICE FOR THE STATE OF SOUTH CAROLINA, 1861, Vol. XIII, Statutes at Large (Rep. Printing 1875).
Several documents directly address the defense of the coast and the establishment of a Coast Police.
See Summary List, Documents dated March 4, 1861 (Document 53), June 22, 1861 (Document 99),
June 24, 1861 (Document 98), June 19, 1861 (Document 101), June 17, 1861 (Document 102), June
11, 1861 (Document 104), October 5, 1861 (Document 114),  October 16, 1861 (Document 141),
December 27, 1861 (Document 152), February 18, 1863 (Document 190), February 20, 1863
(Document 203), and June 25, 1863 (Document 210).

In 1863, an Act relating to the war tax imposed was amended. The Governor was charged
with appointing commissioners to ascertain what parishes should be exempt from such tax. No.
4624, An Act to Amend an Act entitled "AN ACT TO PROVIDE FOR THE PAYMENT BY THE STATE OF

14

THE WAR TAX OF THE CONFEDERATE STATES, AND FOR THE COLLECTION OF THE SAME FROM THE TAX-PAYERS IN THIS STATE," 1863, Vol. XIII, Statutes at Large (Rep. Printing 1875). Documents dated July 22, 1862 (Document 169), August 6, 1862 (Document 174), August 23, 1862 (Document 168) are letters to the Governor relating to the war tax.

Governor's duties also included issuing proclamations prohibiting the exportation of provisions, and violators of such proclamations were subject to penalties. In 1863, a statute was enacted to enforce the Governor's proclamations. Act No. 4635, AN ACT TO ENFORCE ANY PROCLAMATION OF THE GOVERNOR PROHIBITING THE EXPORTATION OF PROVISIONS, 1863, Vol. XIII, Statutes at Large (Rep. Printing 1875). Letters relating to exports are found in Documents dated April 30, 1860 (Document 222), two Documents dated April 3, 1863 (Document 236 and 236a), and one dated April 4, 1863 (Document 235).[14]

The fact that many of the official duties of the Governor, a public official, are specifically addressed by the referenced Documents, lends strong support to the State's position that the Documents are public records.[15]

_____

[14] Other official duties of the Governor during the applicable time period reflected in statutes include endorsing the guaranty of Confederate bonds, Act No. 4633, AN ACT TO PROVIDE FOR A GUARANTY BY THE STATE OF THE BONDS OF THE CONFEDERATE STATES, 1863, Vol. XIII, Statutes at Large (Rep. Printing 1875), and June 29, 1863 (Document 207), Document 208 (undated); appointing officers and surgeons to examine persons claiming exemption from service, Act No. 4663, AN ACT TO PROVIDE FOR VOLUNTEER COMPANIES OF MOUNTED INFANTRY, AND FOR OTHER PURPOSES, 1863, Vol. XIII, Statutes at Large (Rep. Printing 1875); proclaiming by determination of vote those elected to the Congress of the Confederate States of America, Act No. 4664, AN ACT TO PROVIDE FOR THE ELECTION OF MEMBERS OF THE CONGRESS OF THE CONFEDERATE STATES OF AMERICA FROM THIS STATE, 1863, Vol. XIII, Statutes at Large (Rep. Printing 1875); pursuant to police powers, Governor is authorized to exempt persons from military service that he adjudges indispensable for the government, order portion of militia to appear before officers to present claims of exemption, and approve rules and regulations relating to duties of enrolling officers and related surgeons, Act No. 4704, AN ACT TO AUTHORIZE THE GOVERNOR TO REQUIRE THE EXEMPTION OF CERTAIN STATE OFFICERS AND OTHER PERSONS FORM CONFEDERATE SERVICE, 1863, Vol. XIII, Statutes at Large (Rep. Printing 1875) and Act No. 4669, AN ACT TO DECLARE AND AMEND THE EXEMPTION LAW OF THE STATE, AND FOR OTHER PURPOSES, 1863, Vol. XIII, Statutes at Large (Rep. Printing 1875).

[15] Some of the Documents in Debtor's possession appear to be several ordinances adopted at the Convention of the People of the State of South Carolina in December 1860. These Ordinances include an Ordinance to make

Further provision for Executive Offices was made in December 1865 by Act No. 4754,

Statutes at Large of South Carolina, Vol. XIII, Statutes at Large (Rep. Printing 1875). The Act

contained detailed record keeping provisions for the Governor, and also provided that the Secretary

of State was to "collect , deposit and keep in Columbia all the books, records and papers belonging

to thereto["the Executive Chamber"]. Id. Accordingly, under this provision, the Secretary of State

had the responsibility of collecting any records of the Office of the Governor that were missing or

stored elsewhere, which may include the Documents in question in this case. Although these statutes

were enacted following the time periods covered by the Documents, they weaken the Plaintiff's

argument that Governor's records have always been considered private and that the State has

historically kept few record keeping requirements[16]

In a decision concerning records of a state office, the South Carolina Supreme Court found

that certain records were public documents "for the reason that they relate either to the rightful

discharge of the duties of the office of the defendant or to his violation of the official trust reposed

by the state in him . . . ." State v. Farnum, 53 S.E. 83, 85 (1905) (emphasis added). Accordingly,

the Supreme Court's definition of a public record in Farnum is consistent with the nature of the

Documents herein - they relate in many instances to the discharge of the duties of the office of the

---

Provisional Arrangement for the Continuance of Commercial Facilities in South Carolina (Document 2); an
Ordinance to Alter the Constitution of the State of South Carolina, in respect to the Oath of Office (Document 3); an
Ordinance to make Provisional Postal Arrangements in South Carolina (Document 4); and an Ordinance to alter the
Constitution of the State of South Carolina in respect to the Executive Department (Document 5). See Ordinances
and Constitution of the State of South Carolina, with the Constitution of the Provisional Government and of the
Confederate States of America: Electronic Edition. South Carolina. Convention (1860 - 1862), at
http://www.docsouth.unc.edu/southcar/south.html (First edition, 1999, University of North Carolina at Chapel Hill).

[16]   The State produced evidence that the State made efforts to recover records, including executive records,
after the Civil War. See REPORT OF THE SPECIAL JOINT COMMITTEE IN REGARD TO CERTAIN PUBLIC PROPERTY ON
HAND AT THE EVACUATION OF COLUMBIA, p. 24-25 (Fontaine 1866). While this report does not specifically refer to
the Documents in this case, it does tend to evince that executive documents were removed and were intended to be
returned.

16

Governor.

Finally, the State presented evidence that the "docketing" on the back of many of the Documents is consistent with that of the docketing systems in place by governmental offices at that time, and that the Documents are similar in nature and possess similar docketing to other documents from the same Governors' administrations that are currently housed as public documents at the South Carolina Department of Archives. Such a docketing system appears to indicate an intent to preserve the document as relating to the public office. This appears to include originals of documents that relate to official, public duties as well as retained drafts, i.e. drafts intended to be retained in the public office to further the function of the office.

To the extent documents are not original documents or to the extent there is no indication that they were intended to be a retained draft by docketing, such a document may not be a public record. Mere drafts may not be a public record in that they may not be consistent with the actual public record and particularly where there is no indication of an intent to preserve them. In the matter before the Court, the State presented evidence that certain of the Documents may in fact be "retained drafts" of outgoing correspondence. As such, it is possible that a number of the Documents may in fact be in original form preserved in a location accessible to the public. Although the State asserts that docketing on the backs of these documents indicates an intent to retain them as a record of governmental functions, it is unclear as to which of the applicable Documents fall within such a category. As previously noted, the Court was not provided with the original Documents nor requested to make such a distinction, as the parties determined to present their positions as applicable

to the Documents as a whole.[17]  See Op. S.C. Att'y Gen., 1984 WL 159931 (October 26, 1984)

(notes that drafts or notes that are <u>not intended</u> as final evidence of the knowledge to be recorded

may not be a public record) (emphasis added).    Nevertheless, the Court recognizes that an

examination of certain specific Documents may lead to differing conclusions as to their nature.

In sum, the Documents as a whole appear to relate to the official duties of the public office

of the Governor and, for the reasons stated herein, appear to be public records.  Plaintiff did not

provide sufficient evidence that the Documents became personal property on the date of the

respective Governor's resignation, departure, or loss of actual possession – were it not for war

conditions, certain of the Documents would be presumed to have been preserved and dealt with in

the ordinary transition between Governors.  The nature of the Documents having been determined,

title to these records must still be addressed.

### B.    Common Law and Title to the Documents

The Supreme Court of South Carolina has previously addressed title to public records in

varying factual situations.  In <u>Ex parte Whipper</u>, the Supreme Court determined that books and

records being improperly withheld by a public official should be surrendered.  10 S.E. 579, 582

(1890).  In so holding, the Supreme Court definitively stated as follows:

> The records of a public office are in no sense <u>private property</u>.  They are very
> important to every citizen.

<u>Id.</u> (emphasis added).  The Supreme Court was even more definitive on the issue in the early 1900's.

<u>Farnum</u>, 53 S.E. at 85.  In <u>Farnum</u>, a state officer refused inspection of the books and records of the

---

[17]    The Court directed the parties to confer and determine whether the Documents were to be addressed by the
Court in their totality, such that this decision would apply to them all collectively, or whether the Documents were to
be presented separately such that different determinations may be made based upon each one's content.  The parties
agreed to tender a summary list of the 444 Documents and did not seek individual determinations of each
Document's nature and title.

state dispensary and alleged that certain of the documents were private. Id. The Supreme Court

discussed the need for a determination to be made whether the papers relate to private affairs or

relate to the duties of the office or its affairs. In support of its determination that the public records

be turned over by a public official and be retained in the public office, the Court cited an earlier

opinion with respect to records of the Secretary of State. Id. (citing Pinckney v. Henegan, 33 S.C.L.

250, 1848 WL 2877 (2 Strob. Feb. 1848)). In determining that it is the public duty of an officer to

keep records relating to their duties, the Supreme Court quoted as follows:

> The public records in the Secretary of State's office do not belong to the Secretary.
> They are the property of the state. He is the mere keeper under her authority.
> Whatever she will about them, he is bound to obey.

Id. (citing Pinckney, 1848 WL at *2). Furthermore, it has been recognized in South Carolina

commentary that this language in the common law provides support "for the public nature of South

Carolina government documents."    Jean Hoefer Toal and Brandon Riley, The New Role of Secret

Settlements in the South Carolina Justice System, 55 S.C. L. Rev. 761, 762 (2004).

       The Supreme Court reinforced its holding in Ex parte Whipper on several occasions by citing

the determination made therein that "the records of a public office are in so sense private property."

in cases involving objections to the surrender of records by public officials. Burnett v. Langston,

162 S.E. 72, 73 (1932); Carrison v. Young, 118 S.E. 32, 37 (1923).

       More recently, the Supreme Court again addressed the private versus public nature and

ownership of a certain document. American Heart Association v. County of Greenville, 331 S.C.

498, 489 S.E.2d 921 (1997). In American Heart Association, an action was commenced requesting

a declaration that the original will and signature of "Shoeless Joe" Jackson is personal property,

rather than a public record, that should be deemed an asset of his estate. Id. at 500, 489 S.E.2d at

922. The Supreme Court determined that the will was a public record based upon current statutory authority. Therefore, the Supreme Court affirmed the lower court's determination that the deliverer of a will could not gain ownership in the actual document, and determined that ownership could thus not be devised to Jackson's wife or appellant charities. Id. at 500-01, 489 S.E.2d at 922-23. Although a variant of previous factual circumstances, this decision of the Supreme Court appears consistent with its earlier precedent.

Considering the above-cited authority collectively, it appears that the Supreme Court has directly addressed the public nature of a government document and determined the title and ownership of public records.[18]

Finally, it has been generally recognized that public records are considered property of the state and can only lose their nature as a public record pursuant to law:

> [B]ecause public records and documents are the property of the state and not of the individual who has them in his or her possession, the custodian of a public record cannot destroy it, deface it, or give it up without authority from the same source that required the record to be made.

66 AM. JUR. 2D Records and Recording Laws § 11 (May 2004). See also Farnum, 53 S.E. at 85 (public records are property of the state – whatever the state will about them, officers of the state are bound thereto). A decision from the North Carolina Supreme Court has similarly held. State v. West, 293 N.C. 18, 235 S.E.2d 150 (1977). In West, the state of North Carolina brought an action to be declared the owner of two bills of indictment issued in 1767 and 1768. The indictments were in the possession of an individual who had purchased them at an auction.[19] The possessor of the

---

[18]    Such determination renders it unnecessary for this Court to certify a question to the South Carolina Supreme Court on these issues, as will be addressed hereinafter.

[19]    There was no evidence of how the bills of indictment left the court system, however, there was evidence that the indictments had once been in the possession of the Greensboro Historical Museum and sold to another

indictments alleged that he was the owner of them and that the state had abandoned the indictments. The court noted that the indictments were part of the court records and bore upon their face notice of their public nature. The court concluded that title was shown in the state, and there being no showing that the state had intentionally abandoned the property, found that the state was entitled to possession of the indictments. Id., 293 N.C. at 31-32, 235 S.E.2d at 157-58. The court also noted that even if the indictments had been mislaid or lost, or purchased by a subsequent purchaser for value, the one in possession would still be liable to the true owner. Id.

The holding in West has been reiterated by the federal court in North Carolina. United States of America v. North Carolina's Original Copy of the Bill of Rights, No. 5:03-CV-204-BO, slip op. (E.D.N.C. Feb. 19, 2004), vacated and remanded with instructions sub nom., United States of America v. Matthews (In re Matthews), 395 F.3d 477 (4th Cir. 2005) (vacated based upon jurisdictional grounds due to dismissal of related forfeiture action). In the Bill of Rights case, the District Court relied upon the authority set forth by the court in West and determined that the state remained the lawful owner of the Bill of Rights and never abandoned its rights, noting that public records and documents are property of the state and not of the individual that has them in possession, and that removal can only be under authority of the legislature for a purpose so designated. Id. at 6 (citing West, 229 S.E.2d at 832).

These cases appear to stand for the proposition that a subsequent possessor or purchaser of the public documents at issue in those cases, whether lost, mislaid, or stolen documents, cannot acquire superior rights as to the owner. South Carolina law does not appear to be to the contrary. See 9 S.C. Juris. Abandoned and Lost Property §§ 21-23 (1992 & 2004 Supp.) ("A finder acquires

---

individual. West, 293 N.C. at 23-24, 235 S.E.2d at 153.

only such property interest or right as will enable him to keep the property against all the world but the rightful owner"). Additionally, it has been recognized that there is no state authority for a gift of state historic records absent approval of the General Assembly. Op. S.C. Att'y Gen., 1965 WL 11245 (July 23, 1965). In conclusion, it appears that the State has met is burden of proving superior title to the Documents.

### C.    The State Records Act

The State argues that the State Records Act, in particular S.C. CODE ANN. §§ 30-1-10(A) & 30-4-20(c) (Law. Co-op. 1991 rev, & West Supp. 2004), is controlling and provides that the Documents are property of the State of South Carolina. The State also contends that the State Records Act requires persons in possession of public records to deliver them to the legal custodian or Department of Archives as provided therein. S.C. CODE ANN. § 30-1-50 (Law. Co-op. 1991 rev.).

There is no indication that the remedies provided in the State Records Act have retroactive application, and the State has not presented any evidence to convince the Court that the State Records Act is controlling in this matter. Further, the Court notes that § 30-1-50 provides a penalty for failure to deliver records as required under this chapter following receipt of a certified letter from the legal custodian of the record or the Director of Archives.[20]   The State's citation to § 30-1-50 implies that receipt of a written request to turnover public records essentially means that the object of that request is therefore a public record. Such an argument would appear to presuppose a

---

[20]    S.C. CODE § 30-1-50 (Law. Co-op. 1991 rev.) provides as follows:

Fifteen days after receipt of a certified letter from the legal custodian of the record or the Director of the Archives, a person in possession of a public record who refuses or fails to deliver as required in this chapter the record to the requesting party is guilty of a misdemeanor and, upon conviction, is fined not exceeding five hundred dollars. In addition, the legal custodian of the public records or the Director of the Archives may apply by verified petition to the court of common pleas in the county of residence of the person withholding the records and the court shall upon proper showing issue orders for the return of the records to the lawful custodian or the Director of the Archives.

conclusion that the request for turnover automatically renders a document of public nature. To the

extent the State relies upon such an argument, the Court is not persuaded that the State's request for

a document determines whether it is a public document. However, a review of the broad <u>definition</u>

of a public record in the State Records Act, if it were applicable, would weigh in favor of the State's

position that the Documents are public records. See S.C. CODE ANN. § 30-4-20(c).[21]

In conclusion, Plaintiff argues and presented testimony to the effect that the State has been

inactive in preserving public records and that Governor's records are often not maintained by the

Department of Archives. Further, Plaintiff asserts that in 1801 South Carolina Governor Drayton,

whose Governor's papers are at the Department of Archives, urged the legislature in the early 1800's

to require Governors to maintain records. Plaintiff indicates that such a law was never passed.[22]

However, given the previous statutes cited, and the eventual establishment of the Historical

Commission of South Carolina in 1905, it appears that the State has been active in preservation of

---

[21]    A "public record" includes all books, papers, maps, photographs, cards, tapes, recordings, or other
documentary materials regardless of physical form or characteristics prepared, owned, used, in the possession of, or
retained by a public body. Records such as income tax returns, medical records, hospital medical staff reports,
scholastic records, adoption records, records related to registration, and circulation of library materials which contain
names or other personally identifying details regarding the users of public, private, school, college, technical college,
university, and state institutional libraries and library systems, supported in whole or in part by public funds or
expending public funds, or records which reveal the identity of the library patron checking out or requesting an item
from the library or using other library services, except nonidentifying administrative and statistical reports of
registration and circulation, and other records which by law are required to be closed to the public are not considered
to be made open to the public under the provisions of this act; nothing herein authorizes or requires the disclosure of
those records where the public body, prior to January 20, 1987, by a favorable vote of three-fourths of the
membership, taken after receipt of a written request, concluded that the public interest was best served by not
disclosing them. Nothing herein authorizes or requires the disclosure of records of the Board of Financial Institutions
pertaining to applications and surveys for charters and branches of banks and savings and loan associations or
surveys and examinations of the institutions required to be made by law. Information relating to security plans and
devices proposed, adopted, installed, or utilized by a public body, other than amounts expended for adoption,
implementation, or installation of these plans and devices, is required to be closed to the public and is not considered
to be made open to the public under the provisions of this act. S.C. CODE ANN. § 30-4-20(c). The definition of
"public body" is similarly broad. S.C. CODE ANN. § 30-4-20(a).

[22]    Plaintiff presented evidence in the form of Governor Drayton's Executive Journal, which is illegible.
Plaintiff's counsel represented that due to the age of the documents, the copies submitted into evidence are the best
drafts obtainable.

23

its records. The State presented testimony to the effect that the Department of Archives has records

of every South Carolina Governor since 1860 with certain exceptions, and that it is the duty of the

Department of Archives to store and preserve public records. S.C. CODE ANN. § 30-1-100 (Law. Co-

op. 1991 rev.). Further, the State has presented authority, including case law from the highest court

of this State, that official records are public and cannot be considered private property. Plaintiff did

not present convincing evidence to support its conclusion that Governor's records involving public

functions are considered private, and that they are generally kept by each Governor to do with what

they wish.[23] Plaintiff also argues that there are other Governor documents out of the possession of

the Department of Archives, but the State has never pursued receipt of those documents until the

present litigation. However, the nature and ownership of those documents are not before the Court,

and based upon the evidence presented, the State has met its burden of proving its title to these

particular Documents.

## III.   OTHER CLAIMS

Plaintiff argues that even if the State were able to claim the Documents, there are a number

of legal theories and defenses to defeat such claims.[24] Plaintiff first asserts that the claims are barred

---

[23]     In support of his argument, Plaintiff cited a 1959 Attorney General opinion responding to a request for
South Carolina Governor's letters between the years 1942 and 1945. Op. S.C. Att'y Gen., 1959 WL 10669 (Dec. 8,
1959). In the opinion, the Attorney General noted that the papers could not be located at that time and that most of
the Governors during those three years (five Governors occupied the office during this turbulent time) either took
with them or destroyed their papers. Id. The State responded by noting that those records of Governor's during that
time period were in fact located and are housed and preserved by the Department of Archives.

[24]     Plaintiff cites to the statute of limitations, abandonment, waiver, estoppel, laches, unconscionable and
inequitable conduct, and staleness. By Order entered June 8, 2005, the Court directed submission of proposed orders
fully addressing all matters that the parties sought to be considered by the Court. Any issue not specifically
addressed is concerned abandoned as set forth in the Order. Accordingly, the Court addresses the common law
defenses and doctrines as raised by Plaintiff. In two instances in his proposed Order, Plaintiff raises issues
concerning correspondence between Dr. R.L. Meriwether and Plaintiff's ancestors. These two instances are with
respect to the statute of limitations and laches.

by the predecessor to S.C. CODE ANN. § 15-3-530 (Supp. 2004) which currently provides for a three year limitation period for certain matters. He asserts that several sections of the 1942 South Carolina Code of Laws are applicable (§§ 143, 367 and 388) which provide for a six-year limitation period. Plaintiff asserts that the State had actual knowledge of the existence of these documents and their possession by the Law/Willcox family since 1947 based upon the correspondence between Meriwether and Willcox's ancestors, and that the statute of limitations ran in this matter during 1954.

The burden of establishing a statute of limitations bar is on the one asserting it. <u>Brown v. Finger</u>, 240 S.C. 102, 124 S.E.2d 781 (1962).[25]  Plaintiff asserts that Meriwether was a State employee, and that the South Caroliniana Library (the "Library"), as a branch of the University of South Carolina, is a part of the State government. The State contends that Meriwether was acting in his capacity as a Caroliniana Society Secretary rather than as a public employee, and that in any event the State Historical Commission at that time was the only State agency with authority to acquire government records for South Carolina and thus the State could not be bound by the actions of Meriwether or the Library with respect to the Documents.[26]

---

[25]    The Court notes that this matter is not actually one for turnover by the State, but is for declaratory relief. Nevertheless, Plaintiff cited such defenses in the Complaint. As a matter of judicial economy, and inasmuch as the parties have addressed the issue, the Court will address the affirmative defenses raised by Plaintiff, including that of a statute of limitations bar, with respect to Plaintiff's Complaint. The Court expresses no opinion as to whether such defenses could remain as to any later action commenced with respect to these Documents.

[26]    The State also argues that statutes of limitation do not run as to suits for injunctive relief, <u>Richland County v. Kaiser</u>, 351 S.C. 89, 567 S.E. 2d 260 (S.C. Ct. App. 2002). Nevertheless, inasmuch as the litigation before the Court at this time is broader than one for injunctive relief, and inasmuch as statutes of limitations as a general proposition do apply to the State, <u>Condon v. City of Columbia</u>, 339 S.C. 8, 528 S.E.2d 408 (2000), the Court is reluctant to find that the holding in <u>Kaiser</u> extends to this case. The State further argues that statutes of limitations do not run against the State when it is acting in the public interest and not in a proprietary capacity, but the State does not cite any controlling authority for this proposition.

From an examination of the 1940's correspondence, it appears that Meriwether was, as asserted by Plaintiff, corresponding on behalf of the Library. The Library indicates that in 1906, it was recognized that a committee was necessary to perfect the holdings of the library, which housed "caroliniana." In 1931, the President of the University of South Carolina formed a formal committee in an effort to "halt the exodus of the state's historical resources to out-of-state repositories." http://www.sc.edu/library/socar/about.html. This committee later became the University South Caroliniana Society in 1937. In 1940, the South Caroliniana Library was designated as a new institution charged with the "task of documenting the history and literature of the Palmetto State." Id. The Library's collections include books, manuscripts, modern political collections, and university archives. The modern political collection specifically indicates that it collects, preserves, and encourages research in private papers documenting South Carolinians and their government post-World War II. http://www.sc.edu/library/socar/mpc/index.html. The University South Caroliniana Society is a private non-profit organization of the South Caroliniana Library with the sole purpose of supporting the Library in its mission. The Society indicates that the "[p]reservation of the public records of South Carolina is the responsibility of her government, but it is a poor history of a people that is based on government records alone."[27]

In the correspondence at issue, although Meriwether references the Caroliniana Society throughout the papers, which apparently supports the Library, the Letters tend to indicate, as argued by Plaintiff, that Meriwether was in fact acting on behalf of the Library. He specifically requests that the papers be gifted to "our library." See Plaintiff's Exhibit 34, Letter Dated August 18, 1947. Other references are to "our library" in the correspondence.

---

[27]    http://www.sc.edu/library/socar/uscs/index.html.

26

It appears that the Library is part of the University of South Carolina, and such state supported universities have been considered a body of the State of South Carolina. See Olson v. Faculty House, 344 S.C. 194, 544 S.E.2d 38 (S.C. Ct. App. 2001) (the university is a governmental entity under the Tort Claims Act); Paddock Equipment Co. v. University of South Carolina, 289 S.C. 219, 345 S.E.2d 749 (S.C. Ct. App. 1986) (considering the University of South Carolina as a governmental entity in public contract dispute). See also, e.g., S.C. CODE ANN. § 1-11-55 (Law. Co-op. 2005) (university branch of the state is considered a governmental body in statutes governing lease of property); S.C. CODE ANN. § 2-15-50 (Law. Co-op. 2005) (university supported by state funds is state agency for purposes of financial audit provisions). Nevertheless, the question remains whether Meriwether's actions, assuming he was acting as an employee of the Library, are binding upon the State.[28]

It appears well settled that "a public officer derives his authority from statutory enactment, and all persons are in law held to have notice of the extent of his powers, and therefore, as to matters not really within the scope of his authority, they deal with the officer at their peril." Clemson Assoc., Inc. v. Robinson, 259 S.C. 105, 190 S.E.2d 738 (S.C. 1972) (citing authority). See also South Carolina State Highway v. Butterfield, 58 S.E.2d 737 (S.C. 1950). South Carolina law has addressed circumstances in which a public official attempts to bind the State, or another department of the State. In Butterfield, an Assistant Attorney General made representations on behalf of the Highway Department as to actions the Highway Department would take in a condemnation suit. 58 S.E. 2d

---

[28]    Plaintiff notes that half of Governor Hollings' records and the bulk of Governor McNair's records were sent to the University of South Carolina. No further information was provided, and no evidence was presented that such records, or other records noted by Plaintiff to be located elsewhere, are of the same nature as those presented in this case or are private in nature. Furthermore, this Court expresses no opinion on the public or private nature of any other Governor documents.

737. The South Carolina Supreme Court determined that the Assistant Attorney General could not bind the Highway Department, noting that there is "no function imposed upon him by law allowing or permitting him to bind the Highway Department as to what it will do in the future." Id. at 739. In Robinson, the board of trustees of a school district accepted an offer to purchase school district property without the consent of the board of education. 259 S.C. 105, 190 S.E.2d 738. By statute, the board of education must consent to such sale. Id. at 112-13, 190 S.E.2d at 741-42. The Supreme Court concluded that the actions of the board of trustees could not bind the board of education, inasmuch as a public officer derives his authority from statutory enactment, and the board of education was the entity embodied with the authority to sell such property. Id. at 114. Finally, in Baker v. State Highway Dep't, the Supreme Court held that a public officer of the highway department could not bind the state by the highway department officer's agreement to accept alternative funds in contravention of his authority. 166 S.C. 481, 165 S.E. 197 (1932), overruled on other grounds McCall v. Batson, 285 S.C. 243, 329 S.E.2d 741 (S.C. 1985).

It appears that the Historical Commission of South Carolina had the care and custody, by statute, of all of the official archives of the State of South Carolina at the time of the correspondence between Meriwether and Ms. Law and Ms. Storm. S.C. CODE § 2234 (1942). See also S.C. CODE § 9-8 (1952) (same provision).[29] The Historical Commission appears to be the predecessor to the Department of Archives, which was established in 1954. S.C. CODE § 9-3 (1962 and 1975 Cum. Supp.). The statutes provide as follows:

---

[29]    Prior to Ms. Storm's correspondence with Meriwether, Plaintiff presented a number of letters spanning a period of nearly a decade between Ms. Storm and the Southern Historical Society, University of North Carolina concerning acquisition of what appears to be the same Documents at issue in this case. Interestingly, the correspondence reflects that the Southern Historical Society concluded in the late 1940's that the documents are "state house papers." In a letter dated December 3, 1948, the Society indicated that, as a result, they did not believe they had a right under the circumstances to acquire them.

> The objects and purposes of the Historical Commission are: the care and custody of all the official archives of the State not now in current use; the collection of materials bearing upon the history of the State, and of the counties and territory included therein, from the earliest times; the collection of all documents or transcripts of documents and of material relating to the history of South Carolina, and all its territory and inhabitants; and particularly of procuring of data concerning South Carolina soldiers in the war of the Revolution <u>and the war between the States</u>; the due and orderly arrangement, indexing and preservation of the same . . . .

S.C. CODE § 2234 (1942) (emphasis added). <u>See also</u> S.C. CODE § 9-8 (1952) (same provision). Therefore, it appears that the Historical Commission was the official entity by statute with custody of the official archives of the State and the collection of materials bearing upon the history of the State, <u>particularly with respect to the Civil War</u>, at the time of the correspondence at issue. Based upon statutory authority and the law as cited above, and it appearing that the Historical Commission had the official statutory duty to collect historical documents such as those presented in this case, the Commission (the predecessor to the Department of Archives) – or some executive with responsibility for it – would appear to be the entity that would need to be aware of the existence of the Documents in order to be barred from any claim based upon application of a statute of limitation.

Additional support for the proposition that the State is not barred from pursuing the Documents is provided in the common law of the State of South Carolina as previously discussed, which provides that records similar in nature to the Documents are public records, and are not considered private property, unless the legislature divests the State of ownership by statute. <u>See</u> <u>Pinckney v. Henegan</u>, 33 S.C.L. 250, 1848 WL 2877 (2 Strob. Feb. 1848) ("[t]he public records in the Secretary of State's office do not belong to the Secretary; *they are the property of the State*. He is the mere keeper under her authority.") (emphasis added); 66 AM. JUR.2d <u>Records and Recording</u> <u>Laws</u> § 11 (May 2004) (public records and documents are property of the state and it cannot be given

29

up without authority from the source that required it to be made). See also American Heart Assoc., 331 S.C. at 500-01, 489 S.E.2d at 922-23 (will and signature of decedent is a public record; ownership could not be devised). Therefore, for all the reasons cited above, the Court is not convinced that the statute of limitations bars the State from pursuing the Documents.

Plaintiff also argues that the State has abandoned its property rights with respect to the Documents. In order to conclude that an abandonment has occurred, "there must be some clear and unmistakable affirmative act or series of acts indicating a purpose to repudiate ownership." Witt v. Poole, 188 S.E. 496, 498 (S.C. 1936). The primary elements of abandonment are intent to abandon and the external act by which the intention is carried into effect. Id. at 498. Intent to abandon is the paramount inquiry. Id. South Carolina commentary has characterized abandonment as the relinquishment of property with intent to never resume ownership or possession. See 9 S.C. Juris. Abandoned and Lost Property §§ 2 (1992 & 2004 Supp.). See also Historic Charleston Foundation v. Krawcheck, 313 S.C. 500, 507 n.8, 443 S.E.2d 401, 406 n.8 (S.C. Ct. App. 1994) ("To constitute abandonment, it must appear that there was a discontinuance of the use with the intent to relinquish the right to use the property."). Generally, time is of no importance to the issue of abandonment, except possibly to be considered as indicative of intention. Witt, 188 S.E. at 498. Intent is to be considered from all the surrounding facts and circumstances. Historic Charleston Foundation v. Krawcheck, 313 S.C. at 507 n.8, 443 S.E.2d at 406 n.8. The burden is on the party asserting abandonment to prove it by clear and unequivocable evidence. Carolina Land Co. v. Bland, 265 S.C. 98, 108, 217 S.E.2d 16, 21 (S.C. 1975); Hayes v. Tompkins, 287 S.C. 289, 293, 337 S.E.2d 888, 891(S.C. Ct. App. 1985).

Therefore, Plaintiff has the burden of proving the State's abandonment of its right to the

30

Documents by clear and unequivocable evidence. Plaintiff's main support for its abandonment argument relates to the passage of time -that the State apparently ceased looking for the Documents after 1866 and 138 years went by before they asserted a claim. However, the failure on the behalf of the State to locate the Documents should not serve as conclusive evidence that the State ceased looking for them or abandoned such efforts. Further, as previously noted, the passage of time is not an essential element of abandonment. Witt, 188 S.E. at 498. Although time can be indicative of intent, Plaintiff did not clearly establish the State's intent to relinquish its rights to the Documents. The State presented evidence, through a post-Civil War report, that efforts were made to recover public records following the Civil War, and that the report indicates that records of the Executive Department had not been turned over. REPORT OF THE SPECIAL JOINT COMMITTEE IN REGARD TO CERTAIN PUBLIC PROPERTY ON HAND AT THE EVACUATION OF COLUMBIA, p. 6 (Fontaine 1866). Plaintiff asserts that an addendum to the Report provides that such records were in fact returned. Id. However, the provision cited by Plaintiff in the addendum makes no reference to records of the Executive Department. The Report, in conjunction with the eventual establishment of the Historical Commission in 1905, provides support for the State's efforts to maintain the importance of public records and preserve its rights. The Court recognizes that the issue of intent is a factual determination that may be difficult to establish, particularly given the historical record. Nevertheless, the law provides that intent to abandon, considering all the surrounding facts and circumstances, must be clear. Plaintiff was unable to meet his burden of proving such intent on the part of the State.[30]

---

[30]    Plaintiff again notes that the Department of Archives has one set of Governor's records from the Antebellum period, and further emphasizes, as stated earlier, that the State has never initiated a lawsuit for the return of records such as the Documents in this case. Plaintiff also points to the fact that the Department of Archives traveled to England in the 1970's to bid on letters from the 1700's of a former South Carolina Governor. The State

Plaintiff also asserts defenses of laches, staleness, estoppel, and waiver. An essential element of laches is unreasonable delay for or an unexplained length of time. Knowledge of rights, reliance and prejudice are additional elements. <u>Whitehead v. State</u>, 352 S.C. 215, 219, 574 S.E.2d 200, 202 (S.C. 2002). "The party asserting laches has the burden of showing negligence, the opportunity to act sooner, and material prejudice." <u>Richey v. Dickinson</u>, 359 S.C. 609, 598 S.E.2d 307, 309 (S.C. Ct. App. 2004) (citation omitted). Delay does not, alone, constitute laches, and the "failure to assert a right does not come into existence until there is a reason or situation that demands assertion." <u>Muir v. C.R. Bard, Inc.</u>, 336 S.C. 266, 298, 519 S.E.2d 589, 599 (S.C. Ct. App. 1999).

Plaintiff has not presented convincing evidence that there has been unreasonable or unexplained delay, particularly since it appears that the sequence of events with respect to the Documents was a mere consequence of historical events.[31] As noted above with respect to the statute of limitations, the Historical Commission, the entity charged with the care, custody, and collection of material relating to the history of South Carolina, S.C. CODE § 2234 (1942), was not aware that the Documents were in Plaintiff's position until a short period of time prior to the auction. Further, there is little or no evidence of detrimental reliance on the State's position. Therefore, laches does not apply. Likewise, staleness of demand is similarly inapplicable inasmuch as the claims in this

---

asserts that issues with respect to records of Colonial Governors are distinguishable from the Documents in this case. The Court is not convinced that any of these circumstances rise to the level of an intent to abandon the Documents in this case on the State's part.

[31]    Laches has additionally been asserted where an unreasonable delay causes his adversary to incur expenses or otherwise detrimentally change his position. <u>Muir</u>, 336 S.C. at 296, 519 S.E.2d at 598-99. Plaintiff argues that he relied upon Stroup's assertion, denied by Stroup, that the Department of Archives was not interested in the Documents. Plaintiff incurred auction advertising and preparation expenses. The proof of claim filed by the auction house in Plaintiff's bankruptcy case in the approximate amount of $1,300.00 indicates that the expenses were incurred for advertising for July and August. The auction was to occur on August 7, 2005, and the conversation between the auctioneer and Stroup occurred on July 27, 2004. Although the time period between the conversation and the scheduled auction is brief, whether Plaintiff is entitled to reimbursement for incurred expenses, based upon any representations made, is not before the Court.

case have not been shown to have been after an "unexplained delay of such great length as to render

it difficult or impossible for the court to ascertain the truth of the matters in controversy and to do

justice between the parties." All Saints Parish v. The Protestant Episcopal Church, 358 S.C. 209,

236, 595 S.E.2d 253, 268 (S.C. Ct. App. 2004) (quoting Presbyterian Church v. Pendarvis, 227 S.C.

50, 59, 86 S.E.2d 740, 744 (S.C. 1955)).

With respect to Plaintiff's claim of estoppel, the doctrine applies as follows:

> The elements of estoppel as to the party estopped are (1) conduct by the party
> estopped which amounts to a false representation or concealment of material
> facts; (2) the intention that such conduct shall be acted upon by the other
> party; and (3) knowledge, actual or constructive, of the true facts. As to the
> party claiming estoppel, the elements are (1) lack of knowledge and of the
> means of knowledge of the truth as to the facts in question; and (2) reliance
> upon the conduct of the party estopped.

Maher v. Tietex Corp., 331 S.C. 371, 500 S.E.2d 204, 209 (S.C. Ct. App. 1998). Plaintiff alleges

that he relied upon Stroup's assertion, denied by Stroup, that the Department of Archives was not

interested in the Documents on July 27, 2004. Nevertheless, Plaintiff did not convince the Court that

any such representation was made with knowledge of the true facts nor that Plaintiff lacked

knowledge that the State could have a claim for the Documents. Stroup further testified that at the

time the conversation took place, he was not aware as to whether the State would have a claim to the

Documents and that he had not yet fully reviewed them. Further, it is noteworthy that the State only

became involved with communications regarding the Documents in close proximity to the scheduled

auction date of August 7, 2004. According to testimony and the proof of claim filed by the auction

company in this case, advertising expenses had already been incurred as the auction was scheduled

for August 7, 2004. Finally, it has been generally recognized that estoppel does not lie "against the

government to prevent the due exercise of its police power or to thwart the application of public

33

policy." <u>Greenville County v. Kenwood Enterprises, Inc.</u>, 353 S.C. 157, 577 S.E.2d 428 (S.C. 2003) (emphasis added). Accordingly, the elements of estoppel to not appear to have been established.

Finally, waiver has been defined as a "simple voluntary relinquishment of a right with knowledge of all the facts . . . ." <u>City of North Myrtle Beach v. Lewis-Davis</u>, 360 S.C. 225, 599 S.E.2d 462, 466 (S.C. Ct. App. 2004) (citing <u>South Carolina Tax Comm'n v. Metropolitan Life Ins. Co.</u>, 266 S.C. 34, 40, 221 S.E.2d 522, 524 (1975)). Plaintiff alleges that Stroup's conduct in assuring the auctioneer that the State had no interest in the Documents constitutes waiver. However, as previously noted, Stroup testified that he had not yet fully reviewed the Documents. In any event, in order to constitute waiver, the waiving party must have knowledge of all the facts. <u>Id.</u>[32] Inasmuch as Stroup testified that he had not yet fully reviewed the Documents at the time of the conversation with the auctioneer, it does not appear that Stroup had knowledge of all the facts in order to voluntarily relinquish a right to the Documents.[33] Accordingly, the Court is not convinced that the common law defenses and doctrines raised by Plaintiff bar the State's claims based upon the evidence presented.

## IV.   CERTIFICATION OF QUESTIONS OF LAW

The State alternatively has moved for certification of questions of law in this case to the South Carolina Supreme Court. Plaintiff opposed such certification. South Carolina Appellate Court Rule 228 provides the procedure for certification of a question of law from another court and

---

[32]   Knowledge of the true facts is also an element of estoppel, and the analysis set forth with respect to this analysis of waiver is thus equally applicable to the doctrine of estoppel as addressed herein.

[33]   Plaintiff also alleges that the State's claims should be barred by the inequitable conduct of the State, through the action of Stroup by misleadingly promising the auctioneer that he was not interested in making a claim to the Documents, as previously discussed. Stroup testified that he did not recall making such a promise. In any event, the Court was not convinced by the evidence presented that Stroup acted in bad faith or in an inequitable manner.

in pertinent part states as follows:

> (a) Scope of Certification. The Supreme Court in its discretion may answer <u>questions of law</u> certified to it by any federal court of the United States or the highest appellate court or an intermediate appellate court of any other state, when requested by the certifying court if there are involved in any proceeding before that court questions of law of this state which may be determinative of the cause then pending in the certifying court <u>when it appears to the certifying court there is no controlling precedent</u> in the decisions of the Supreme Court.

Rule 228, SCACR (emphasis added).

Certification of a question of law to a state court in a bankruptcy case is an appropriate procedure when the issue is based solely on unsettled state law or involves complex state law questions. <u>See</u> <u>Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)</u>, 156 F.3d 1114 (11th Cir. 1998); cf. <u>Pyne v. Hartman Paving, Inc. (In re Hartman Paving, Inc.)</u>, 745 F.2d 307, 309 n.2 (4th Cir. 1984).[34]  Furthermore, certification rests in the discretion of the federal court. <u>Lehman Bros. v. Schein</u>, 416 U.S. 386, 390, 94 S. Ct. 1741, 1744 (1974).  It is within this Court's jurisdiction to apply the state law, and based upon the statutory authority and common law, the issues presented before this Court, while unique factually, do not appear to present an issue to which there is no controlling precedent under South Carolina law.  Further, Plaintiff opposed certification. Certification thus appears unnecessary.

## CONCLUSION

This decision is limited to the Documents at issue in this case, and the unique circumstances and evidence presented to the Court, and the Court expresses no opinion as to the public nature or ownership of any other Governor documents or other official documents.  While the parties

---

[34]    The court in <u>Pyne</u> concluded that certification of a question to the West Virginia Supreme Court of Appeals was inappropriate because there was controlling precedent on the issue of state law.

presented policy considerations to be weighed by the Court, the decisions reached by the Court is

not one of policy, but is based as required upon applicable state law and other precedent. Further,

this Court cannot use equity to create new substantive rights or to override the provisions of state

law. East Tennessee Natural Gas Co. v. Sage, 361 F.3d 808, 823 (2004); In re Three Flint Hill Ltd.,

202 B.R. 706, 712 (Bankr. D. Md. 1995). Although not decided lightly, given the evidence

presented by the content of the Documents and their recitation of official and public matters, as well

as the common law applied to these particular facts, it appears that the State is the rightful owner of

its public records as represented by the Documents. Accordingly, it is hereby

 **ORDERED** that the Documents are not considered property of the estate; and it is further

 **ORDERED** that the State has met its burden of proving superior title to its public records;

and it is further

 **ORDERED** that the State's alternative Motion for Certification of Questions of Law to the

State Supreme Court is rendered moot or alternatively is denied; and it is further

 **ORDERED** that based upon the Consent Order entered on March 3, 2005 requested by the

parties, the Willcox and Patterson Defendants' claims are moot by the determination of the issues

decided herein; and it is further

 **ORDERED** that all issues presented in this adversary proceeding having been determined,

this proceeding shall be closed.

**AND IT IS SO ORDERED.**

        *John Waites*
        **UNITED STATES BANKRUPTCY JUDGE**

Columbia, South Carolina
August 15, 2005